**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------x
JUAN VASQUEZ,

:

             Petitioner,        **REPORT & RECOMMENDATION**

:

      -against-         **07 Civ. 7575 (DLC)(MHD)**

:

H.D. GRANHAM, Superintendent of
the Auburn Correctional Facility

:

             Respondent.
--------------------------------x

**TO THE HONORABLE DENISE L. COTE, U.S.D.J.:**


       Petitioner Juan Vasquez seeks a writ of habeas corpus challenging his 2004 conviction in the New York State Supreme Court, New York County, on one count of Assault in the First Degree. The court sentenced petitioner to a determinate prison term of twelve years, which he is currently serving.


       In his petition, Vasquez advances one ground for relief. He claims that the trial court erred in its decision not to charge the lesser-included offense of Assault in the Second Degree. In opposition, respondent argues that petitioner's claim is not cognizable on federal habeas review. Alternatively, he argues that the claim is meritless.


       For the reasons that follow, we conclude that the claim does

1

not justify federal habeas relief. We therefore recommend that the writ be denied and the petition dismissed with prejudice.

I. <u>Procedural History</u>

    A. <u>Introduction</u>

      On March 2, 2004, Vasquez went to trial before the Honorable Philip M. Grella, S.C.J., and a jury on a two-count indictment that charged him with Assault in the First Degree and Criminal Contempt in the First Degree. (Decl. of Assistant Att'y General Ashlyn Dannelly, Esq. Ex. B at 2, Jan. 9, 2008). The charges stemmed from an incident that occurred on June 10, 2003 at 590 West 174th Street in Manhattan. On that day, petitioner threw a pan of hot oil at his girlfriend, Rosa Rodriguez Santos ("Rodriguez"). As a result, she suffered second-degree burns on her arm and face, with permanent scarring and discoloration. The jury convicted Vasquez on the assault charge and acquitted him of criminal contempt, a charge based on his having allegedly violated an order of protection in favor of Rodriguez.

    B. <u>Trial and Sentencing</u>

      All of the evidence at trial was introduced by the

prosecution, as petitioner chose to present no evidence. (Mem. of Law in Opp'n to the Pet. for a Writ of Habeas Corpus 6).

At trial, Rodriguez testified that she had met petitioner in the Dominican Republic in 1999 and that they had dated for a number of years. (Tr. vol. 2 3-4, 116-17).[1] Petitioner, a United States citizen, and Rodriguez, a citizen of the Dominican Republic, moved from the Dominican Republic to the United States in 2001 and lived together with petitioner's parents in Florida for six months. (Id. at 5, 117-18). They then moved to New York and continued to live together. (Id. at 5-7). While living in New York, Rodriguez worked six days a week as a waitress at Margarita's Restaurant, generally from 4:00 p.m. to 1:00 a.m. (Id. at 7-8).

On June 10, 2003, Rodriguez met petitioner at the corner near Margarita's at about 1:00 a.m., and they walked home together. (Id. at 8). Rodriguez testified that during the walk Vasquez had asked her about a few men who were at the restaurant, and that she had felt nervous during the conversation. (Id. at 9-10). She went to bed, but awoke at some point that same night and saw petitioner walking back and forth, holding what Rodriguez described as a table knife. (Id. at 10-12). Petitioner then placed the knife under his

_____

[1] The trial transcript, although bound as one volume, contains separate pagination for the jury selection and the trial itself, the pages for which are labeled as "Volume 2".

pillow and lay down. (<u>Id.</u> at 11).

The next morning, petitioner and Rodriguez left the apartment together. (<u>Id.</u> at 25-26). Rodriguez returned home at approximately 12:30 p.m., and Vasquez returned separately some time later. (<u>Id.</u> at 26). Vasquez asked her where she had been, and she responded that she had gone to the fifth floor of their building to inquire about moving, but she testified, "I didn't see that he [petitioner] believed me." (<u>Id.</u> at 27). She also stated that "[a]s soon as I arrived to the apartment he [petitioner] got there and I saw him and I knew it wasn't good because I observed him, he was not doing well and he asked me where I was." (<u>Id.</u> at 163). Apparently alarmed by Vasquez's demeanor, Rodriguez then went to the bathroom and called her brother, Ramon Rodriguez. (<u>Id.</u> at 27).

Ramon Rodriguez testified that he had spoken with his sister while he was driving his taxi and that the phone conversation took place around 3:15 p.m. and lasted about five or six minutes. (<u>Id.</u> at 215-16). He stated that his sister had a "very elevated," "high pitched, like sort of like nervous tone." (<u>Id.</u> at 214). After the conversation ended, he continued working. (<u>Id.</u> at 216).

When Rodriguez returned from the bathroom, she saw that petitioner was heating a pan of oil on the stove on a high flame,

4

and that the oil was "bubbling." (<u>Id.</u> at 27-28, 31). When Rodriguez asked Vasquez why he was heating the oil, he responded that he was going to heat up food so that he could eat before he left her to go to live with his family. (<u>Id.</u> at 28). Rodriguez responded that there was no food there that he could heat up. (<u>Id.</u>).

Vasquez left the kitchen momentarily, and shortly afterward Rodriguez went in. (<u>Id.</u> at 28). Vasquez followed her into the kitchen and threw the pan of oil towards her, striking her face and arm. (<u>Id.</u> at 28-29). He then took her pocketbook and left the apartment. (<u>Id.</u>).

———

Rodriguez testified that she had rented her room in the apartment from two people, Josefa Portillo and Eugenio Zayas, both of whom were in the apartment when Vasquez threw the pan of hot oil at her. (<u>Id.</u> at 128, 156). Zayas testified that at approximately 11:30 a.m. on June 10, 2003, he saw petitioner and Rodriguez in the kitchen, and shortly afterward "heard some loud screams, oh, someone burnt my face, burnt my face." (<u>Id.</u> at 220). He came out and asked Rodriguez what had happened, and she replied that Vasquez had burned her face. (<u>Id.</u>). Zayas later heard petitioner scream about losing her pocketbook. (<u>Id.</u> at 221-22).

According to Rodriguez, after Vasquez left the apartment,

Zayas said that it was not necessary to call 911 because Vasquez
had left and he did not see anything on her face. (Id. at 35).
Zayas testified that he put a towel with cold water on Rodriguez's
face and thought about calling 911, and that he actually went into
the bedroom to do so, but that Rodriguez left the apartment when he
went to make the call. (Id. at 220, 223-24). Zayas also stated that
he saw water and drops of oil on the kitchen floor and oil and
water on top of the stove. (Id. at 224-25). He had not seen
petitioner since the day of the incident. (Id. at 227).

Rodriguez left the apartment and went to the apartment of her
friend Maria DeGarcia. (Id. at 35, 204). DeGarcia testified that
when Rodriguez arrived, her face was very red and "[s]he was crying
and she had a towel over here rubbing it, because it was hurting a
lot." (Id. at 205).[2] DeGarcia called the police and went to the
hospital in the ambulance with Rodriguez. (Id. at 205-07).

Dr. Roger Yurt, a physician at New York Presbyterian Hospital,
testified as both a fact witness and an expert. (Id. at 253, 255,
257).[3] He reviewed Rodriguez's medical records and confirmed that

---

[2] It is unclear what "here" refers to, but it seems as if Ms.
DeGarcia was talking about Rodriguez's face. (Tr. vol.2. 205).

[3] At the time of trial, Dr. Yurt had been practicing medicine
for twenty-five years, and had been involved with the hospital's
burn center for twenty-two years and its director for eight
years. (Id. at 253-54).

6

she had been brought to the hospital's emergency room at approximately 5:30 p.m. on June 10, 2003. (<u>Id.</u> at 257-58). The emergency room records indicated that Rodriguez "had a burn on the left side of her face high on her cheek and around her eye and a small burn on her right arm." (<u>Id.</u> at 258). Because of her condition, she was admitted to the Burn Intensive Care Unit. (<u>Id.</u> at 258). Although Rodriguez complained of blurry vision, subsequent evaluation by an ophthalmologist determined that there was no injury to the eye. (<u>Id.</u> at 287). Rodriguez did not have any life-threatening injuries, nor did her injuries permanently damage her bodily functioning in any way. (<u>Id.</u> at 288).

Dr. Yurt stated that the burns that Rodriguez had sustained were second-degree or partial-thickness burns, and that they were later determined to be superficial partial-thickness burns. (<u>Id.</u> at 260, 265).[4] While she was at the hospital, her wounds were debrided twice a day, and she received Percocet for the pain caused by the burns. (<u>Id.</u> at 268-69).[5] Dr. Yurt concluded that Rodriguez's

_____

[4] According to Dr. Yurt, a diagnosis of superficial partial-thickness burns means that enough skin remains for the wound to heal without scarring. (Tr. vol.2 264). This is in contrast to a deep partial thickness burn, which leaves less skin and therefore takes a long time to heal and may leave scarring. (<u>Id.</u> at 264-65).

[5] Debridement is a process in which dead skin is removed and antibiotic cream is placed on the wound, a procedure that Yurt described as painful. (<u>Id.</u> at 268-69).

injuries were consistent with hot oil striking her face, although on cross-examination he conceded that he could not determine whether another liquid besides oil had been used. He reaffirmed, however, that it was possible that a combination of boiling oil and water had caused her injuries. (Id. at 272-73, 277, 286).

Dr. Yurt stated that oil burns are usually more dangerous and deeper than ordinary burns. (Id. at 268). He also said that heated cooking oil can cause serious physical injury. (Id.). Furthermore, he stated that a burn near the eye can be worse than a burn to the skin.[6] (Id.).

With regard to discoloration from burns, Rodriguez's hospital records stated that the area of her burns was red. (Id. at 270). After looking at photographs of Rodriguez's burns, Dr. Yurt concluded that the discoloration on her cheek and arm had been caused by a hot liquid. (Id. at 272-73). He stated that generally oil burns heal within six months to a year, and that discoloration is present while the wound heals, but that it is possible for discoloration to remain after a year. (Id. at 270). He said that after a year, a second-degree burn usually does not change in

---

[6] The testimony is somewhat ambiguous as to whether the doctor was referring to burns near the eye or injury to the eye itself. The distinction, however, is not critical to our analysis.

appearance. (Id. at 289).

Dr. Yurt testified that Rodriguez was discharged from the hospital on June 16th, six days after admission. (Id. at 273-74). She was given instructions regarding how to care for her burns and met with a social worker. (Id. at 274, 292). Dr. Yurt provided follow-up care for Rodriguez, but at trial he indicated that he had not seen her since June 30, 2003. (Id. at 275, 285-86). He examined her the day before he testified, and as of that time Rodriguez's face was still discolored. (Id. at 275-76). Dr. Yurt agreed, however, that Rodriguez's injuries had healed nicely and that her face looked considerably better than it had previously. (Id. at 311).

Rodriguez testified that after she left the hospital, she went to a shelter and then went to live with her brother for a week. (Id. at 56). She eventually moved to a new residence at the end of July. (Id.).

In the wake of this incident, an order of protection was issued in favor of Rodriguez against petitioner on September 7, 2003. (Tr. vol.1. 264; Tr. vol.2 49).[7] However, Rodriguez testified

---

[7] It is unclear from the record which court issued the order of protection.

9

that on September 7, 2003, petitioner visited her while she was at
work. (Tr. vol.2 49-50). Rodriguez also said that on September 8,
she saw Vasquez standing on the corner near Margarita's as she was
arriving for work, but she did not talk to him. (Id. at 51-52). On
that same day, petitioner tried to reach her by calling
Margarita's. (Id. at 53). Rodriguez stated that after that day,
petitioner called her daily for a week, but she would only talk to
him for three to five minutes. (Id. at 53-54). She also saw him
around five times after September 8, because he would stand
approximately a block away from Margarita's. (Id. at 56-57).

On September 29, 2003, Rodriguez saw petitioner at 10:00 p.m.
as she was leaving work with a co-worker named Eunice. (Id. at
182). She stated that Eunice got into a car with a man, a mutual
friend named Hernan Santiago, and that petitioner then appeared,
saying that if Rodriguez did not talk to him he would kill her, and
that he had a knife. (Id. at 183-84). Rodriguez testified that
petitioner grabbed her clothing and took her cell phone. (Id. at
186-87).

Eunice Almonte corroborated Rodriguez's account of that
incident. She testified that she had met Rodriguez while working at
Margarita's. (Id. at 229). On September 29, 2003, at 10:00 p.m.,
she and Rodriguez saw Vasquez, whom Almonte identified as "El

10

Bori." (Id. at 229-32).  Almonte said that El Bori wanted to speak
with Rodriguez but that Rodriguez refused to speak with him. (Id.
at 232).  Almonte moved away from where petitioner and Rodriguez
were standing but was still able to see them. (Id. at 233).  She
also heard Rodriguez tell petitioner that she did not want to speak
with him.  (Id. at 233-34).  Almonte stated that while this was
happening, Rodriguez seemed nervous.  (Id. at 233).  She further
stated that petitioner took Rodriguez's cell phone and that
Rodriguez then started to cry. (Id. at 234).

        During the course of the trial, defense counsel requested that
the court charge two versions of Assault in the Second Degree,
pursuant to subdivisions 1 and 2 of New York Penal Law § 120.05, as
lesser-included offenses of Assault in the First Degree.[8] (Id. at
337-38).  The provisions invoked by counsel define second-degree

_____

    [8] First-degree assault is defined by New York Penal Law
§ 120.10(1) as follows:

    A person is guilty of assault in the first degree when:

    (1) with intent to cause serious physical injury to
    another person, he causes such injury to such person or
    to a third person by means of a deadly weapon or a
    dangerous instrument.

N.Y. Penal Law § 120.10(1) (McKinney 2005).

    Although we cite the 2005 edition of McKinney's Penal
Law, the pertinent sections have either not been amended
since before 2003 or have been amended in ways immaterial to
the crimes as charged in this indictment.

assault as either intentionally causing "serious physical injury" to another person (albeit without the use of a deadly weapon or a dangerous instrument, as required for first-degree assault) or intentionally causing physical injury to another by use of a deadly weapon or dangerous instrument (but not "serious physical injury," as required for first-degree assault).[7a] The prosecutor joined in the defense attorney's request only to the extent of seeking a charge of second-degree assault pursuant to New York Penal Law § 120.05(2), based on the use of a deadly weapon or dangerous instrument to cause physical injury. (Id. at 340-41).

Justice Grella denied the requests. In doing so he ruled that the first version of second-degree assault could not be charged as a lesser-included offense because there was no "reasonable view of the evidence where a jury . . . could find that if all the other

---

[7a] Under New York Penal Law sections 120.05(1)-(2),

A person is guilty of assault in the second degree when:

(1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person; or

(2) With intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or dangerous instrument.

N.Y. Penal Law §§ 120.05(1)-(2)(McKinney 2005).

12

elements were met, that there would be an absence of a dangerous instrument." (Id. at 339). He observed that if the jury believed that Vasquez had injured Rodriguez, the only reasonable view of the evidence would be that her injuries were caused by the hot oil, which constituted a dangerous instrument. (Id.). The judge further stated that if the jury were to find that no dangerous instrument had been used, then Vasquez must be acquitted of the charged crime, and could not be convicted on another charge. (Id.).

With regard to the second version of second-degree assault, Justice Grella stated that this could not be charged as a lesser-included offense of Assault in the First Degree. (Id. at 341-42). In explaining his ruling, he stated that the mens rea of second-degree assault is intent to cause physical injury, not intent to cause serious physical injury, and one is not a lesser-included offense of the other because they are based on different theories. (Id. at 341).

At the conclusion of the trial, the jury convicted petitioner of Assault in the First Degree and acquitted him of Criminal Contempt in the First Degree. (Id. at 453). Justice Grella sentenced petitioner to a determinate term of twelve years imprisonment, and issued an order of protection in favor of Rodriguez. (S. Tr. 7-8).

13

B.  <u>Direct Appeal</u>

Petitioner appealed his conviction to the Appellate Division, First Department. On that appeal, he asserted one ground for relief -- that the trial court had erred in not charging the lesser-included offense of Assault in the Second Degree as defined by Penal Law § 120.05(2). (Dannelly Decl. Ex. A at 15-21).[8] Petitioner noted that the trial court had declined to charge this offense because, in its view, the two assault provisions did not share the same required mental state, and he argued that New York law clearly establishes that second-degree assault is a lesser-included offense of first-degree assault. (<u>Id.</u> at 15, 18-19 (citing <u>People v. Walker</u>, 306 A.D.2d 56, 761 N.Y.S.2d 35 (1st Dep't. 2003); <u>People v. Mahoney</u>, 122 A.D.2d 815, 505 N.Y.S.2d 694 (2d Dep't. 1986)). He further asserted that there was a reasonable view of the evidence under which the jury might have acquitted him of first-degree assault while convicting him of the lesser charge. (<u>Id.</u> at 19-20). Finally, he argued that the trial court's ruling had denied him his due-process right to a fair trial. (<u>Id.</u> at 20).

In response, the State argued that the trial court was correct in refusing to charge the lesser-included offense because, even

---

[8] Vasquez did not argue on appeal, as he did before the trial court, that he had been entitled to an alternative second-degree assault instruction under section 120.05(1).

though second-degree assault is a lesser-included offense of first-degree assault, there was no reasonable view of the evidence by which the jury could have convicted Vasquez of the lesser charge. (Dannelly Decl. Ex. B at 17-23). It also argued that petitioner had not preserved the constitutional dimension of his claim because he did not argue in his trial-court objection that the failure to charge the lesser-included offense deprived him of his due-process rights. (Id. at 18).

In Vasquez's reply, he argued that the State should be estopped from defending the trial court's refusal to submit the lesser charge to the jury because at trial it had joined defendant's request that the lesser-included offense be charged.[9] (Dannelly Decl. Ex. C at 1-3).

On January 19, 2006, the Appellate Division affirmed Vasquez's conviction. People v. Vasquez, 25 A.D.3d 465, 810 N.Y.S.2d 124 (1st Dep't 2006). In doing so, it ruled that

> [t]he evidence established that defendant heated a pan of oil on a stove and deliberately threw it in the victim's face, causing protracted disfigurement. There was no reasonable view of the evidence, viewed most favorably to defendant, that he only caused, or only intended to

---

[9] While Vasquez did not make the estoppel argument in his initial brief, he did refer to the fact that the prosecutor had joined in the initial request. (See Dannelly Decl. Ex. A at 15).

cause, nonserious physical injury.

25 A.D.3d at 466, 810 N.Y.S.2d at 124.


_____Vasquez next sought leave to appeal to the New York Court of Appeals. On April 25, 2006, that court denied petitioner's leave application. People v. Vasquez, 6 N.Y.3d 854, 816 N.Y.S.2d 760 (2006).


C.   Proceedings in this Court


Having been rebuffed by the state courts, petitioner filed a pro se petition for a writ of habeas corpus in this court. He asserts, as he did in state court, that the trial court erred when it refused to charge second-degree assault as a lesser-included offense.


Respondent argues that this claim is not cognizable in a habeas proceeding, because Supreme Court precedent does not clearly establish a due-process right to a lesser-included-offense charge in non-capital cases. (Mem. in Opp'n 10-11). He also asserts that the Appellate Division was correct in rejecting petitioner's claim because there was no reasonable view of the evidence under which a trier of fact could find that petitioner intended to cause physical injury but did not intend to cause serious physical injury. (Id. at

16

12). In a reply, Vasquez reiterates the estoppel argument contained in his state-court appellate brief. (Traverse 1-3).[10]

II. <u>Analysis</u>[11]

_____In weighing a claim pressed by a habeas petitioner, our review of the challenged state-court decision is limited by the terms of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 377-90 (2000); <u>Larrea v. Bennett</u>, 368 F.3d 179, 180 (2d Cir. 2004). Under section 2254(d), a person held in state custody as a result of a state-court judgment who asserts a habeas claim that was decided on the merits by the highest available state court can prevail on that claim only if the adjudication in state court

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[10] Petitioner's estoppel argument, which the Appellate Division implicitly rejected, is purely a matter of state law, and accordingly we do not address it here.

[11] Neither party disputes that the petition is timely and that the claims contained in it are exhausted; therefore, we do not address either issue.

28 U.S.C. §§ 2254(d)(1)-(2). In this case, the Appellate Division addressed the merits of Vasquez's challenge to the denial of a lesser-included-offense instruction, and hence the limiting provisions of section 2254(d) apply. See Cotto v. Herbert, 331 F.3d 217, 229-30 (2d Cir. 2003). Those provisions preclude relief here.

The Supreme Court has held that in capital cases a defendant has a constitutional right to an instruction on a lesser-included offense if the evidence warrants it. Beck v. Alabama, 447 U.S. 625, 637-38 (1980). In Beck, the Court stated that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case." Id. at 38. However, the Supreme Court expressly reserved the question of whether the Due Process Clause requires that the jury be given a lesser-included-offense charge in non-capital cases, id. at 638 n.14., and has not yet resolved that question. In the wake of Beck, the Second Circuit has also declined, in the habeas context, to rule on whether there is a constitutional right to a lesser-included-offense charge in non-capital cases, stating that it is precluded from doing so because it would be creating a new constitutional rule in violation of Teague v. Lane, 489 U.S. 288 (1989). See Jones v.

Hoffman, 86 F.3d 46, 48 (2d Cir. 1996)[12]; see also Jones v. Donnelly, 487 F. Supp. 2d 403, 409 (S.D.N.Y. 2007); Mannix v. Phillips, 390 F. Supp. 2d 280, 295 (S.D.N.Y. 2005) (citing Jones, 46 F.3d at 48).[13]


Because the Supreme Court has not decided whether there is a constitutional right to a lesser-included-offense charge in non-capital cases, Beck 447 U.S. at 638 n.14, the Appellate Division's decision cannot be said to have been "contrary to" "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For much the same reason, the challenged decision did not unreasonably apply "clearly established Federal law," since the Supreme Court has not spoken to the precise question and the Second Circuit has not suggested that other Supreme Court case law has, by implication, established a

---

[12] Since Jones was decided, the so-called "new rule" rule of Teague has been superseded by section 2254(d)(1). See Williams, 529 U.S. at 379-80.

[13] In United States v. Zapata-Tamallo, 833 F.2d 25, 28 (2d Cir. 1987), an appeal from a federal conviction, the Second Circuit stated, in dictum, that due process requires that a lesser-included-offense charge be submitted to a jury "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." Id. (internal quotation marks omitted) (quoting Hopper v. Evans, 456 U.S. 605, 612 (1982)) (alteration in original). Later habeas decisions, however, have not treated this as precedent, but rather have declined to rule on the issue. Jones, 86 F.3d at 48 (citing Rice v. Hoke, 846 F.2d 160, 164 (2d Cir. 1988)); Knapp v. Leonardo, 46 F.3d 170, 179 (2d Cir. 1995); Jones v. Speckard, 827 F. Supp. 139, 146 (W.D.N.Y 1993) (in dictum), aff'd mem., 14 F.3d 592 (2d Cir. 1993); Smithwick v. Walker, 758 F. Supp. 178, 187 (S.D.N.Y 1991), aff'd mem., 948 F.2d 1278 (2d Cir. 1991).

principle that denial of lesser-included-offense instructions in non-capital cases may violate due process. 28 U.S.C. § 2254(d)(1); see Beck, 447 U.S. at 638 n.14; Jones, 86 F.3d at 48.

Nonetheless, in the interest of completeness and in deference to petitioner's pro se status, we note that an argument might be formulated for the notion that, based on prior precedent, even in a non-capital case an egregiously erroneous failure by a trial judge to provide a lesser-included-offense charge might trigger a due-process problem if the error were sufficiently prejudicial to the defendant. That said, in this case no such showing can be made by petitioner.

Challenges to jury charges are generally not of constitutional dimension, and habeas relief is not usually granted for a claim that a jury charge violated state law. See, e.g., Estelle v. McGuire, 502 U.S. 62, 71-72 (1991) (citing Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983)). Nonetheless, if a defective instruction "infected the entire trial," the error may rise to the level of a due-process violation. Cupp v. Naughten, 414 U.S. 141, 147 (1973); Davis v. Strack, 270 F.3d 111, 123, 131-32 (2d Cir. 2001). Otherwise stated, the question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Id. at 123 (quoting Cupp, 414 U.S. at 147); accord

Jackson v. Edwards, 404 F.3d 612, 624-25 (2d Cir. 2005) (noting that courts must examine whether denial of charge was "'sufficiently harmful to make the conviction unfair'") (quoting Davis, 270 F.3d at 124).

By way of example, a criminal defendant has a constitutional right to a "meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citing California v. Trombetta, 467 U.S. 479, 485 (1984)). The right to present a defense is a "minimum essential[] of a fair trial." United States v. Almonte, 956 F.2d 27, 30 (2d Cir. 1992) (quoting Chambers v. Mississippi, 410 U.S. 284, 294 (1973)). As part of this constitutional right, the defendant is entitled to "a jury charge that reflects any defense theory for which there is a foundation in the evidence." United States v. Abcasis, 45 F.3d 39, 42 (2d Cir. 1995) (internal quotation marks omitted) (quoting United States v. Johnson, 994 F.2d 980, 988 (2d Cir. 1993)); see also Davis, 270 F.3d at 124 (citing People v. Padgett, 60 N.Y.2d 142, 144-45, 468 N.Y.S.2d 854 (1983)); accord, e.g., Jackson, 404 F.3d at 624-27. The defendant has a right to such an instruction even if the trial court believes that the defense is "tenuous." United States v. Bok, 156 F.3d 157, 163 (2d Cir. 1998) (citing United States v. Dove, 916 F.2d 41, 47 (2d Cir. 1990)).

Presumably, pro se petitioner would argue in this case that if he established a sufficiently viable evidentiary basis for a lesser-included-offense instruction, the failure to provide it would trigger a due-process violation, at least if it seems likely that a jury, given the option to convict on the lesser charge, would have chosen to do so. In this case, even assuming the viability of such a legal theory, we find no evidentiary basis to sustain it.

As the Second Circuit noted in both Jackson and Davis, the court first must consider whether state law required an instruction that the state court failed to grant. See Jackson, 404 F.3d at 621-24; Davis, 270 F.3d at 124-31. Since the record did not compel the requested charge under New York law, Vasquez's hypothetical claim must fail.

Section 300.05(1) of the New York Criminal Procedure Law addresses the appropriateness of lesser-included-offense instructions, stating

> In submitting a count of an indictment to the jury, the court in its discretion may, in addition to submitting the greatest offense which it is required to submit, submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater. If there is no reasonable view of the evidence which would support such a finding, the court may not submit such lesser offense.

N.Y. Crim. Proc. Law § 300.50(1) (McKinney 2005). In People v. Glover, 57 N.Y.2d 61, 453 N.Y.S.2d 660 (1982), the Court of Appeals read the discretionary language of section 300.05(1) as reflecting an entitlement of a defendant to such a charge in defined circumstances, and it specified a test for determining whether the defendant is entitled to a lesser-included-offense charge:

> To establish entitlement to a lesser included offense charge, the defendant must make two showings. First, it must be shown that the additional offense that he desires to have charged is a 'lesser included offense,' i.e., that it is an offense of lesser grade or degree and that in all circumstances, not only in those presented in the particular case, it is impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense. That established, the defendant must then show that there is a reasonable view of the evidence in the particular case that would support a finding that he committed the lesser offense but not the greater.

Id. at 64, 453 N.Y.S.2d at 661.

When determining whether a jury should be charged with a lesser-included offense, the court must examine the evidence in the light most favorable to the defendant, although the jury may accept or reject any of the evidence it is given. People v. Galvin, 104 A.D.2d 527, 528, 479 N.Y.S.2d 896, 898 (3d Dep't 1984) (citing People v. Henderson, 41 N.Y.2d 233, 236, 391 N.Y.S.2d 563, 566 (1976)). The focus of the analysis is on whether a jury could reasonably acquit defendant of the greater crime and convict him of the lesser crime, not whether there is persuasive evidence that

defendant was guilty of the greater crime. See e.g., People v. Hartman, 4 A.D.3d 22, 26-27, 772 N.Y.S.2d 396, 400 (3d Dep't 2004) (citing People v. Van Norstrand, 85 N.Y.2d 131, 136, 623 N.Y.S.2d 767, 770 (1995)).

The parties in this case do not dispute that second-degree assault is a lesser-included offense of first-degree assault. (Dannelly Decl. Ex. A at 18-19 (citing Walker, 306 A.D.2d at 57, 761 N.Y.S.2d at 36; Mahoney, 122 A.D.2d at 815-16, 505 N.Y.S.2d at 696) & Ex. B at 20 (citing People v. Green, 56 N.Y.2d 427, 432, 452 N.Y.S.2d 389, 392 (1982)). Nevertheless, for petitioner to have been entitled to the lesser charge of second-degree assault, there must be a reasonable view of the evidence to support the finding that he was guilty of second-degree assault and not guilty of first-degree assault. The conclusion of the Appellate Division on this question is certainly defensible.

Under Penal Law § 120.10(1), first-degree assault requires that the defendant (1) intend "to cause serious physical injury," (2) cause "serious physical injury" and (3) do so by use of a "deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.10(1) (McKinney 2005). Under New York Penal Law § 120.05(2), second-degree assault requires that the defendant (1) intend "to cause physical injury," (2) cause such injury and (3) do so by use

24

of a "deadly weapon" or "dangerous instrument." N.Y. Penal Law §
120.05(2) (McKinney 2005).

According to New York Penal Law §10.00(9), "physical injury"
is defined as "impairment of physical condition or substantial
pain." N.Y. Penal Law §10.00(9) (McKinney 2005). "Serious physical
injury" is defined as "physical injury which creates a substantial
risk of death, or which causes death or serious and protracted
disfigurement, protracted impairment of health or protracted loss
or impairment of the function of any bodily organ." N.Y. Penal Law
§10.00(10) (McKinney 2005). "Dangerous instrument" is defined as
"any instrument, article or substance . . . which, under the
circumstances in which it is used, attempted to be used or
threatened to be used, is readily capable of causing death or other
serious physical injury." N.Y. Penal Law §10.00(13).

The Appellate Division concluded that petitioner was not
entitled to the lesser charge of second-degree assault under
section 120.05(2) because there was no reasonable view of the
evidence that suggested that Vasquez intended to cause only non-
serious physical injury. Vasquez, 25 A.D.3d at 466, 810 N.Y.S.2d at
124. It noted that "[t]he evidence established that defendant
heated a pan of oil on a stove and deliberately threw it in the
victim's face, causing protracted disfigurement." Id. An

25

examination of the record supports the court's conclusion that there was no reasonable view of the evidence to suggest that Vasquez intended to inflict only non-serious physical injury, as opposed to serious physical injury, on Rodriguez.

At trial, Rodriguez testified that Vasquez was heating up oil on a high flame for approximately three minutes, until it was "bubbling." (Tr. vol.2. 27-28, 30-31). Rodriguez stated that approximately four minutes after she turned off the flame, petitioner threw the contents of the pan towards her face, striking her face and arm. (Id. at 29-31). Rodriguez was hospitalized and admitted to the Burn Intensive Care Unit because of the severity of her burns. (Id. at 257-58).

As Dr. Yurt testified, cooking oil in a pan can cause serious physical injury, and a burn near the eye can be more severe than a burn to the skin. (Id. at 268). Furthermore, he testified that burns pose a high risk of infection, and that second-degree burns increase this risk. (Id. at 260-62). There is also risk of shock associated with burns. (Id. at 262). Moreover, Rodriguez testified that she was in considerable pain when she was admitted to the hospital, as well as when her wounds were treated. (Id. at 38-39).

Although Rodriguez did not sustain any life-threatening injuries and did not suffer long-term impairment of bodily

functioning (Tr. vol.2. 288), she testified that she had scars on her arm and a scar on her face which still itches. (Id. at 40-41). Furthermore, although Rodriguez's burns finally healed, her face was still disfigured at the time of trial. (Id. at 275-76, 311). According to Dr. Yurt, the appearance of a second-degree burn is not likely to change after a year. (Id. at 289). Such disfigurement is ample to demonstrate serious physical injury. See e.g., People v. McDuffie, 293 A.D.2d 287, 740 N.Y.S.2d 48, 49 (1st Dep't 2002) (citing People v. Bailey, 275 A.D.2d 663, 713 N.Y.S.2d 535, 535-36, lv. denied, 95 N.Y.2d 960, 722 N.Y.S.2d 477 (1st Dep't 2000)).

    Given the evidentiary record and legal requirements, it was certainly reasonable for the Appellate Division to conclude that there was no reasonable view of the evidence that would lead to the conclusion that by throwing a pan of hot oil at Rodriguez, petitioner did not intend to cause serious physical injury. If so, petitioner could not have been acquitted of first-degree assault and convicted of the lesser charge. See, e.g., People v. Moloi, 135 A.D.2d 576, 521 N.Y.S.2d 794, 795 (2d Dep't 1987) (upholding defendant's conviction of first-degree assault when he threw a pot of boiling oil at the complaining witness, because his actions demonstrated intent to cause serious physical injury). Because the injuries to Rodriguez were plainly a predictable result of Vasquez's actions in boiling oil and then throwing it in her face, the Appellate Division reasonably held that the record would not

27

justify a finding that Vasquez had acted in this manner but did not intend the inevitable consequences of his actions.

Since petitioner's demand for a lesser-included-offense instruction was not supported by the record, he was not denied his due-process rights when no such charge was given. Necessarily, then, the decision of the Appellate Division to affirm the trial court's ruling was not an "unreasonable application" of federal law under 28 U.S.C. § 2254(d)(1) and did not rest on any findings not permitted by the evidentiary record. See 28 U.S.C. § 2254(d)(2).

III. <u>Conclusion</u>

For the reasons noted, we conclude that petitioner is not entitled to habeas relief. We therefore recommend that the writ be denied and the petition dismissed with prejudice. We further recommend that no certificate of appealability be issued.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Denise L. Cote, Room 1040, 500 Pearl Street, New York, New York 10007-1312, and to the chambers of the undersigned, Room 1670, 500

New York, New York 10271

Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied, 474 U.S. 1111 (1986); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989)); 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: New York, New York**
        **August 11, 2008**

                              **RESPECTFULLY SUBMITTED,**

                              **MICHAEL H. DOLINGER**
                              **UNITED STATES MAGISTRATE JUDGE**

29

Copies of the foregoing Report and Recommendation have been mailed
today to:

Mr. Juan Vasquez
04-A-2617
Auburn Correctional Facility
135 State Street
Box 618
Auburn, New York 13024


Ashlyn Dannelly, Esq.
Assistant Attorney General for the State of New York
120 Broadway
New York, New York 10271